**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| SOUTHWEST AIRLINES PILOTS ASSOCIATION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:21-cv-02608-M |
| SOUTHWEST AIRLINES CO., | § § § | |
| Defendant. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 11), filed by Defendant Southwest Airlines Co., and Objections to and Motion to Strike Portions of Defendant's Motion to Dismiss Evidence (ECF No. 20), filed by Plaintiff Southwest Airlines Pilots Association.  For the reasons stated below, the Motion to Dismiss is **GRANTED** and the Motion to Strike is **DENIED AS MOOT**.  Plaintiff's claims against Defendant are **DISMISSED**.

### I.     Background

#### A.  The Collective Bargaining Agreement

Plaintiff Southwest Airlines Pilots Association ("SWAPA") is the sole collective bargaining unit on behalf of more than 9,000 pilots employed by Defendant Southwest Airlines Co. ("Southwest").  The current collective bargaining agreement ("CBA") between SWAPA and Southwest has an effective date of September 1, 2012, through August 31, 2020.  However, the parties are currently engaged in negotiations to amend the CBA, as provided in Section 28 of the CBA.  Southwest App'x (ECF No. 13-2) at App. 19.  The parties agree that under Section 6 of

1

the Railway Labor Act, the existing CBA remains in effect pending completion of negotiations. *Id.*; Amended Compl. ("FAC") (ECF No. 7) ¶ 8.

Section 1(A) states that the CBA is meant "to provide for the operation of the Company under methods which will further, to the fullest extent possible, the safety of air transportation, the efficiency of operation and the continuation of employment of all pilots under safe and reasonable working conditions and proper compensation." Southwest App'x at App. 32.

Section 15—which is relevant to wrongful conduct SWAPA alleges was committed by Southwest—dictates how disciplinary action by Southwest against pilots may be conducted and appealed. As a preliminary matter, § 15(A) allows pilots to respond to "disciplinary action" by filing a "grievance" in accordance with § 16 of the CBA, notes that "verbal counseling and Letters of Counseling do not constitute disciplinary action and may not be grieved," sets "just cause" as the disciplinary standard for "non-probationary pilots," and dictates that Southwest will adhere to "progressive discipline" in dealing with pilots. *Id.* at App. 180.

Section 15(D)(4) and (6) of the CBA details the process for investigating a possible disciplinary case:

> Investigation will not be complete without a pilot being afforded the opportunity for a meeting with the Chief Pilot, Assistant Chief Pilot or designee who is on the SWA Master Pilot Seniority List. The purpose of the meeting is to allow the pilot to be advised of and respond to the allegations against him. The notice of such meeting shall summarize the date(s) and event(s) and allegations in question and be provided to the pilot and the Association in writing.
>
> The pilot shall be afforded the opportunity to respond to information described above before a decision is rendered. If necessary, the meeting shall be recessed for a reasonable period of time in order to provide the pilot with adequate time to prepare and/or respond.

*Id.* at App. 182.

Section 15(E)(1)–(2) describes the administration of discipline:

> Discipline will be administered by the Chief Pilot, Assistant Chief Pilot or designee who is on the SWA Master Pilot Seniority List in a meeting with the pilot. [SWAPA] has the right to be present at this meeting. If circumstances will not reasonably permit a meeting with the pilot, written notice of the discipline will be mailed or delivered to the pilot at his last known address. The decision shall state the discipline and specific grounds for that discipline. A copy of such written notice of discipline will be provided to [SWAPA] upon request.
>
> Once discipline has been administered, a pilot *will not be subject to additional discipline based on the same event or occurrence*.

*Id.* (emphasis added).

The CBA contains grievance and arbitration procedures in §§ 16 and 17.  Under § 16(A)(1)(a), "grievances" are defined to encompass "[d]isputes arising out of the interpretation or application of this Agreement concerning rates of pay, rules or working conditions."  *Id.* at App. 184.  Section 17(B)(1)(a) establishes a System Board of Adjustment ("System Board"), which is the mandatory forum for resolving disputes about CBA terms:

> In compliance with the Railway Labor Act, as amended, the parties have established the Southwest Airlines Pilots' System Board of Adjustment for the purpose of adjusting and deciding disputes which may arise under the terms of this Agreement and which are properly submitted to it.

*Id.* at App. 189.

Section 17(C)(2) specifically defines the jurisdiction of the System Board as encompassing disputes about the "interpretation and application of the parties' Agreement."  *Id.* at App. 190.

Section 18(A) gives Southwest the right to select pilots as "Check Airmen" to perform additional duties: "Check Airmen are pilots with Southwest Airlines with the full protection that is offered to all pilots from the Southwest Airlines Pilots' Association.  These pilots are selected as Check Airmen *by the Company* to perform this additional duty."  *Id.* at App. 194 (emphasis added).

### B.  Pleaded Facts

In January 2014, Southwest selected pilot Captain Timothy Roebling to perform, in addition to his normal duties, Check Airman[1] duties, which include ensuring that other pilots meet competency standards during training and while in service.  *See* FAC ¶ 26.  Before April 2019, Southwest retracted a policy that prohibited SWAPA participation by Check Airmen, thus allowing all pilots to actively participate in SWAPA.[2]  *See id.* ¶¶ 22, 30.

In the spring of 2019, SWAPA created a Check Airmen Committee to improve working conditions, rules, and pay for Check Airmen and to forge collaboration between them and SWAPA.  *Id.* ¶¶ 27, 29.  In April 2019, a Southwest manager allegedly told Captain Roebling that if he took a SWAPA committee position, he would be stripped of his Check Airman qualification.  *Id.* ¶ 30.  On June 3, 2019, Captain Roebling started serving as Co-Chair of the SWAPA Check Airmen Committee.  *Id.* ¶ 31.  SWAPA generally alleges that, as a result of becoming Co-Chair, Captain Roebling was taken off Southwest projects and insulted by his peers.  *See id.* ¶¶ 32.  However, SWAPA does not allege that Captain Roebling was stripped of his Check Airman position ("CA Position") as a result of taking the Co-Chair position.  *See id.* ¶¶ 31–33.  In December 2020, Captain Roebling voluntarily resigned as Co-Chair.  *Id.* ¶ 33.  SWAPA does not allege that Captain Roebling was an active participant in SWAPA after he resigned as Co-Chair in December 2020.

---

[1] References to "Check Airmen" in this Opinion include both Check Airmen and Standards Check Airmen, who train fellow Check Airmen.  Throughout 2014–2021, Captain Roebling held both titles.

[2] On June 22, 2018, Southwest revised its Flight Operations Training Manual ("FOTM"), prohibiting Check Airmen from actively participating in SWAPA. Specifically, the revision stated that pilots who have a Check Airman "authorization letter on file at Southwest Airlines are prohibited from participating in SWAPA-controlled committees and from serving as an officer in the SWAPA organization."  *Id.* ¶ 21.  SWAPA alleges that this policy followed "years of whisper campaigns and private admonishments against pilots from getting involved with SWAPA."  *Id.* ¶ 23.  Southwest retracted this FOTM policy sometime before April 2019, allowing all pilots to actively participate in SWAPA.

Captain Roebling was subsequently investigated for allegedly making inappropriate comments in text messages.  Specifically, the FAC describes a February 10, 2021, text exchange between several Check Airmen, in which an unnamed Check Airman ("Person B") asked the group to identify the owner of a pair of shoes in a photo.  The FAC alleges that Person B stated that the shoes were not owned by a "Puerto Rican fence climber," and that Captain Roebling responded with the word "vagina."  *See id.* ¶ 34.

Southwest allegedly investigated a "few" of the participants in the group text exchange, including Person B.  *Id.*  On March 5, 2021, Captain Roebling received "verbal counseling" from his Chief Pilot in connection with the text messages.  *Id.*  Captain Chris Meehan, the Director of the Standards Department, which oversees the evaluation of all Southwest pilots, investigated Captain Roebling.  *Id.* ¶¶ 29 n.3, 35.  On March 11, 2021, Captain Roebling received a letter of counseling.  *Id.* ¶ 36.  On March 25, 2021, Captain Meehan revoked Captain Roebling's CA Position, but retained his pilot status.  *See id.* ¶ 35.  When asked whether the "vagina text was the only reason" that Captain Roebling lost his CA Position, Captain Meehan allegedly said yes.  *Id.* ¶ 36.

In the FAC, SWAPA alleges that Southwest revoked other pilots' Check Airman status at unspecified times, but contends that those pilots did not have union affiliation and "fail[ed] to meet the technical functions of administering their job duties."  *Id.* ¶ 39.  In contrast, SWAPA alleges that Captain Roebling was the only one on the text exchange to lose his CA Position and was "singled out because of his SWAPA history."  *Id.* ¶¶ 37–38.

### C.  The Grievance

On June 1, 2021, Captain Roebling, who is represented by SWAPA, filed a Grievance with Southwest, alleging a violation of the CBA and the Railway Labor Act ("RLA").

Grievance (ECF No. 13-1 Ex. 1-A) at App. 8.  In the Grievance, SWAPA alleges that Southwest "frowned upon Captain Roebling's affiliation with SWAPA and participation in union activities." *Id.*  It asserts that Southwest "improperly terminated" him from his CA Position "in violation of the [CBA] and the [RLA]" and that the Grievance specifically "addresses the Company's CBA violations." *Id.*

SWAPA claims that, in stripping Captain Roebling of his CA Position, Southwest violated the CBA Sections 15(A), 15(D)(4), 15(D)(6), and 15(E)(1)–(2) for the following reasons: (1) he was improperly "re-discipline[d] for the same incident" when he was verbally counseled by his Chief Pilot, received a letter of counseling from Southwest, and was stripped of his CA Position by Captain Meehan; (2) his CA Position was not revoked by his Chief Pilot; and (3) a letter of counseling and termination of him from his CA Position were not proper "progressive" discipline under the CBA.  *Id.* at App. 9–10.  In September 2021, Southwest offered to expedite arbitration of the Grievance under the CBA and toll the statute of limitations for the RLA claims during the expedited arbitration proceeding, but SWAPA declined, and instead filed this suit.  ECF No. 12 at 15.

### D.  Procedural History

On October 20, 2021, SWAPA filed its Original Complaint, accusing Southwest of violating Section 2, Third and Fourth of the RLA[3] by wrongfully disciplining Captain Roebling in retaliation for his past union participation, reflecting Southwest's history of anti-union animus. Compl. (ECF No. 1).  SWAPA seeks the following relief: (1) that Southwest be enjoined from interfering with SWAPA by, among other actions, "disciplin[ing]" employees for their involvement with or support for the union; (2) that Southwest restore Captain Roebling's CA

---

[3] These provisions of the RLA prohibit a carrier's interference with union representation.

Position; (3) a declaration that Southwest's conduct against Captain Roebling violates the RLA; and (4) punitive and monetary damages. *Id.* at 19–20. On November 5, 2021, SWAPA filed a verified Amended Complaint. FAC at 22–29. On November 19, 2021, Southwest moved to dismiss the case for lack of jurisdiction and failure to state a viable claim. ECF No. 11. On December 24, 2021, SWAPA moved to strike portions of Southwest's evidence that Captain Roebling engaged in inappropriate conduct between 2017 and 2021. ECF No. 20.

## II.   Applicable Law

### A.   Railway Labor Act

The Railway Labor Act ("RLA"), 45 U.S.C. §§ 151–65, 181–88, was enacted in 1926 as "an agreement worked out between management and labor, and ratified by the Congress and the President." *Chi. & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 576 (1971). The RLA governs labor relations in the railroad and airline industries. To effectuate peaceful dispute resolution, the RLA sets out a "mandatory and 'virtually endless' process of 'negotiation, mediation, voluntary arbitration, and conciliation.'" *BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers*, 973 F.3d 326, 334 (5th Cir. 2020) (quoting *Burlington N. R.R. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 444 (1987)).

The RLA imposes a duty on carriers and employees to make every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes to avoid interruption to the carrier's operation. 45 U.S.C. § 152, First. "Once bargaining has resulted in an agreement, however, not all disputes over changes in the terms of employment are subject to a continuing duty to negotiate." *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.-Airline Div. & Teamsters Loc. 19 v. Sw. Airlines Co.* ("*Teamsters*"), 875 F.2d 1129, 1133 (5th Cir. 1989) (en banc) (citation omitted).

7

Under the RLA, labor disputes are characterized as either "major" or "minor," and the

RLA provides separate tracks of resolution for each. "'Major' and 'minor' do not necessarily

refer to important and unimportant disputes, or significant and insignificant issues; rather, the

terms refer to the bargaining context in which a dispute arises. Major disputes involve proposals

for new agreements or for changes in existing agreements. Minor disputes, on the other hand,

involve grievances over the application of an existing agreement." *Id.* at 1133.

The Fifth Circuit recently summarized the difference between major and minor disputes

and the respective procedures for resolving them under the RLA:

> A dispute is "major" where a party seeks new agreement terms "affecting rates of
> pay, rules, or working conditions." 45 U.S.C. § 152, Seventh; § 156. Major disputes
> "relate[ ] to ... the formation of collective agreements or efforts to secure them."
> *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945). Therefore, in a major
> dispute the "issue is not whether an existing agreement controls the controversy"
> or an "assertion of rights claimed to have vested in the past" but "[t]hey look to the
> acquisition of rights for the future." *Id.*
>
> To initiate the major dispute procedures under Section 156 of the RLA, a party must
> first serve a Section 6 notice of the proposed changes. 45 U.S.C. § 156. Within
> thirty days after the notice is served, the parties are obligated to begin
> "conferences." *Id*. If no agreement can be reached voluntarily through negotiation,
> "[m]ajor disputes go first to mediation under the auspices of the National Mediation
> Board; if that fails, then to acceptance or rejection of arbitration; and finally[,] to
> possible presidential intervention to secure adjustment." *Elgin*, 325 U.S. at 725
> (internal quotations and citations omitted). During the pendency of a major dispute,
> "the parties are obligated to maintain the status quo, and the employer may not
> implement the contested change in rates of pay, rules, or working conditions."
> *Conrail*, 491 U.S. at 302–03. Finally, it is only once "this protracted process ends
> and no agreement has been reached, the parties may resort to the use of economic
> force," such as striking. *Id.* at 303.
>
> Minor disputes, on the other hand, "contemplate[ ] the existence of a collective
> agreement already concluded" and "relate[ ] either to the meaning or proper
> application of a particular provision." *Elgin*, 325 U.S. at 723. Thus, a proposed
> action creates a minor dispute "if the action is arguably justified by the terms of the
> parties' collective bargaining agreement. Where, in contrast, the employer's claims
> are frivolous or obviously insubstantial, the dispute is major." *Conrail*, 491 U.S. at
> 307. A party faces a "relatively light burden" to show that a dispute is minor, *id.*,
> and "if there is any doubt as to whether a dispute is major or minor a court will

8

construe the dispute to be minor." *Ry. Labor Execs. Ass'n v. Norfolk & W. Ry.*, 833 F.2d 700, 705 (7th Cir. 1987).

In Section 153, the RLA provides a more streamlined process for minor disputes. *See Elgin*, 325 U.S. at 727–28. After failed negotiation, "[a] minor dispute ... is subject to compulsory and binding arbitration before the National Railroad Adjustment Board ... or before an adjustment board established by the employer and the unions representing the employees." *Conrail*, 491 U.S. at 303–04 (citing 45 U.S.C. § 153). Striking and other self-help tactics arising out of minor disputes are prohibited. *Id.* at 304. And, in a minor dispute, a party is permitted to move unilaterally on its "own interpretation of the agreement pending exhaustion of arbitration." *Int'l Bhd. of Teamsters v. Sw. Airlines*, 875 F.2d 1129, 1133 (5th Cir. 1989) ("*Teamsters*") (en banc); *CSX Transp., Inc. v. United Transp. Union*, 879 F.2d 990, 997 (2d Cir. 1989) ("The status quo provisions of the RLA generally do not apply in minor disputes, enabling the carrier to act on its own interpretation pending arbitration.").

*BNSF*, 973 F.3d at 334 (some citations omitted).

The provisions of the RLA allegedly violated by Southwest—Section 2, Third and Fourth—provide for protection of the union organization from interference by the carrier.

Section 2, Third provides:

Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives.

45 U.S.C. § 152, Third.

Section 2, Fourth provides:

Employees shall have the right to organize and bargain collectively through representatives of their own choosing . . . No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier... to influence or coerce employees in an effort to induce them . . . not to join or remain members of any labor organization.

45 U.S.C. § 152, Fourth.

## B.  Norris-LaGuardia Act

The Norris-LaGuardia Act ("NLGA") refers to 29 U.S.C. §§ 101–16, a 1932 federal labor law that bans "yellow dog" contracts (*i.e.*, employment contracts that prohibit employees from joining unions as a condition of employment), permits employees to form unions without employer interference, and limits federal courts from issuing injunctions in nonviolent labor disputes.

The Fifth Circuit recently provided the following guidance regarding a district court's authority to issue an injunction under the RLA and NLGA:

> Further limiting a court's authority to issue an injunction in a railway labor dispute is the Norris-LaGuardia Act ("NLGA"). 29 U.S.C. § 108, et seq. Congress enacted the NLGA in 1932 intending to "tak[e] the federal courts out of the labor injunction business." *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 712, 102 S. Ct. 2672, 73 L.Ed.2d 327 (1982) (quoting *Marine Cooks & Stewards v. Panama S.S. Co.*, 362 U.S. 365, 369, 80 S. Ct. 779, 4 L.Ed.2d 797 (1960)) (emphasis omitted). By narrowing the courts' jurisdiction to enjoin labor disputes, Congress hoped to stop courts from indiscriminately awarding injunctions against striking employees—a practice that had become commonplace across federal courts. *See Nat'l Woodwork Mfrs. Ass'n v. N.L.R.B.*, 386 U.S. 612, 620, 87 S. Ct. 1250, 18 L.Ed.2d 357 (1967) (stating that "[f]ederal court injunctions freely issued against all manner of strikes and boycotts under rulings that condemned virtually every collective activity of labor as an unlawful restraint of trade"). For example, Section 8 of the NLGA precludes injunctions except where the plaintiff has "ma[d]e every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." § 108.

> If the NLGA totally divested the courts of power to issue an injunction, however, the RLA's mandates would ring hollow. "To accommodate the competing demands of the RLA and the Norris LaGuardia Act, our cases establish that the Norris-LaGuardia Act does not deprive the federal court of jurisdiction to enjoin compliance with various mandates of the Railway Labor Act." *Burlington N. R.R. Co.*, 481 U.S. at 445, 107 S. Ct. 1841 (citing cases). But this exception is a limited one. "[W]hen a violation of a specific mandate of the RLA is shown, courts should hesitate to fix upon the injunctive remedy . . . unless that remedy alone can effectively guard the plaintiff's right." *Id.* at 446, 107 S.Ct. 1841.

*BNSF*, 973 F.3d at 337–38.

## III.   Legal Standards

Dismissal is permitted if a court lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A case is presumed to lie outside the scope of a federal court's subject matter jurisdiction, and the burden of establishing otherwise rests with the party seeking to invoke the court's jurisdiction. *Id.* "It is incumbent on all federal courts to dismiss an action whenever it appears that subject matter jurisdiction is lacking." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998).

In evaluating a motion to dismiss pursuant to Rule 12(b)(1), a court may consider (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). Applying the "plausibility" standard from *Iqbal* and *Twombly*, the Fifth Circuit has held that:

> In construing the allegations in the complaint, the Court is obliged to disregard "legal conclusions; mere 'labels'; '[t]hreadbare recitals of the elements of a cause of action'; 'conclusory statements'; and 'naked assertions devoid of further factual enhancement.'"

*Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc) (footnotes omitted).

Indeed, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "A sheer possibility that a defendant has acted

unlawfully" is not sufficient to satisfy a plaintiff's pleading obligations.  *Iqbal*, 556 U.S. at 678;

*Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011).

     In the Fifth Circuit, the party seeking a preliminary injunction must show: (1) a

substantial likelihood of success on the merits; (2) that it will suffer irreparable harm if the

injunction is not granted; (3) that the harm the movant will suffer if the injunction is not granted

would outweigh the harm to the non-movant if the injunction were granted; and (4) that the grant

of the injunction is in the public interest.  *Local Union No. 733 of Int'l Bhd. of Elec. Workers v.

Ingalls Shipbuilding Div., Litton Sys., Inc.*, 906 F.2d 149, 151 (5th Cir. 1990).  The party seeking

the injunction bears the burden of persuasion on each preliminary injunction factor.  *See

Cherokee Pump & Equip., Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994).

## IV.     Analysis

     Southwest moves to dismiss the Complaint for lack of subject matter jurisdiction, arguing

that the dispute underlying SWAPA's claims is a "minor" labor dispute subject to mandatory

arbitration.  Alternatively, Southwest moves to dismiss for failure to state a plausible claim for

relief under Section 2, Third and Fourth of the RLA.

     Whether or not a labor dispute is major or minor typically controls whether a federal

court has jurisdiction to grant injunctive relief under the RLA.  For major disputes, injunctive

relief is available to maintain the status quo while the dispute is being resolved.  *Teamsters*, 875

F.2d at 1134.  In contrast, the Fifth Circuit has recognized that injunctive relief is rarely available

during resolution of a minor dispute.  *Id.* ("[O]nly in a narrow set of cases may unilateral action

be enjoined during resolution of a minor dispute."); *Int'l Ass'n of Machinists & Aerospace

Workers, Airline Dist. 146 v. Frontier Airlines, Inc.* ("*Frontier*"), 664 F.2d 538, 541 (5th Cir.

1981) ("[I]njunctive relief is inappropriate in a 'minor' dispute case, because the statutorily

established grievance procedures are mandatory and exclusive.").  Minor disputes are subject to "compulsory and binding" arbitration, and federal courts typically do not have jurisdiction to resolve them under the RLA.  *Bhd. of Ry. Carmen v. Atchison, T. & S. F. R. Co.* ("*Atchison*"), 894 F.2d 1463, 1468 n.10 (5th Cir. 1990).

However, the Fifth Circuit has recognized that federal courts may retain jurisdiction to resolve minor disputes if the plaintiff sufficiently pleads that either of two "exceptional" circumstances exist: (1) the "dispute-resolution framework of the RLA is either ineffective . . . or unavailable" or (2) actions were taken by the carrier "for the purpose of weakening or destroying a union."  *Id.* (recognizing "two types of special circumstances in which federal courts may assert jurisdiction over cases that would otherwise involve minor disputes subject to compulsory arbitration under the RLA").  The Fifth Circuit has held that allegations of sufficient anti-union animus may qualify as an exception to the rule that minor disputes are subject to mandatory arbitration, because animus claims "cannot 'be conclusively resolved' by interpreting or applying a CBA."  *Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.* ("*BLET*"), 31 F.4th 337, 345 (5th Cir. 2022), Pet. for Writ of Cert., *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen*, No. 22-220 (U.S. Sept. 9, 2022).

Accordingly, the jurisdictional analysis is intertwined with the Rule 12(b)(6) analysis, because whether the Court has jurisdiction over minor disputes depends on whether SWAPA has plausibly alleged sufficient facts, including allegations of anti-union animus, so as to fall into a special circumstances exception as identified by the Fifth Circuit in *Atchison*.  *Id.*

### A.  Determination of Whether the Dispute is Minor

Southwest argues that this dispute is "minor" because Southwest was "arguably justified" in revoking Captain Roebling's CA Position under § 18(A) of the CBA, which gives Southwest

the right to select Check Airmen.  *See Consol. Rail Corp. v. Ry. Labor Execs. Ass'n* ("*Conrail*"),

491 U.S. 299, 307 (1989).  Southwest contends that revoking a CA Position does not constitute

discipline, but even if it is considered disciplinary, Southwest argues that such discipline was

"arguably justified" under § 15 of the CBA.  *See id.*  Accordingly, Southwest asserts that this is a

"minor" dispute subject to the compulsory grievance and arbitration procedures under the RLA.

*See Wright v. Union Pac. R.R. Co.*, 990 F.3d 428, 435 (5th Cir. 2021) ("[D]istrict courts do not

have jurisdiction over minor disputes, which are 'subject to compulsory and binding arbitration

before the National Railroad Adjustment Board, [45 U.S.C. § 153], or before an adjustment

board established by the employer and the unions representing the employees.'" (second

alteration in original)).

      The Court agrees that it lacks subject matter jurisdiction over the parties' dispute as to

whether Captain Roebling's CA Position was wrongly revoked.  The CBA vests in Southwest

the ability to select pilots as Check Airmen to perform the additional duty of training their peers.

CBA § 18(A) (ECF No. 13-1 at App. 194).  Thus, under the CBA, SWAPA agreed to allow

Southwest to govern who is granted additional Check Airman duties.  Accordingly, whether

Southwest can unilaterally deselect Check Airmen—given its ability to select pilots for the

position—is an interpretation to be made under CBA Section 18(A).  The CBA also vests in

Southwest the ability to take "progressive" disciplinary action against "non-probationary pilots"

for "just cause."  CBA § 15(A) (Southwest App'x at App. 180).  The provision explicitly notes

that verbal and written "counseling" does not constitute discipline under the CBA, but it does not

include an exhaustive list of disciplinary actions and does not expressly prohibit revocation of

Check Airman duties as a disciplinary measure.  *See id*.  Thus, under the CBA, SWAPA agreed

that Southwest could exercise its judgment in choosing whether discipline is warranted and if so,

the appropriate discipline, while trying to avoid immediate termination.  Whether revoking a CA

Position is appropriate "progressive[] discipline" after an investigation reveals inappropriate

conduct depends on an interpretation of Section 15 of the CBA.

In light of the plain terms of the CBA, the Court concludes that Southwest's

interpretation of the CBA, that it had the power to unilaterally remove Captain Roebling's CA

Position either under the Check Airmen or discipline provisions of the CBA, is neither frivolous

nor obviously insubstantial.  *See Teamsters*, 875 F.2d at 1134 ("[I]f management's construction

of the collective bargaining agreement and its unilateral action pursuant thereto create an issue

that is not fictitious or merely colorable, then the issue should be resolved by the appropriate

arbitration board.").  The parties' dispute here concerns the interpretation and application of the

CBA, and the Court concludes it is a minor dispute subject to compulsory and binding

arbitration.[4]  In addition, as will be discussed later in this opinion, because SWAPA does not

plausibly allege anti-union animus or any of the other "special circumstances" recognized by the

Fifth Circuit, no exception applies to the general rule that federal courts lack jurisdiction over

minor disputes.

SWAPA does not appear to dispute that the revocation of Captain Roebling's CA

Position, as detailed in the Grievance, is a "minor" dispute.  Instead, SWAPA argues that its

claims in this lawsuit for coercion and interference under the RLA is separate from the minor

---

[4] The Court notes that this case presents a different set of facts than those in *Carter v. Transport Workers Union of America Local 556 and Southwest Airlines Co.*, 353 F. Supp. 3d 556 (N.D. Tex. 2019), in which a court in this District found that a disciplinary dispute involving Southwest did not qualify as minor.  The union in *Carter* negotiated a CBA with Southwest, but there, the plaintiff did not allege a breach of the CBA.  Instead, her RLA Section 2, Third and Fourth claims were predicated on allegations that the termination of her employment constituted "retaliat[ion]" against her for speech "protected by the RLA and the Constitution" and for her religious beliefs "in violation of Title VII." *Id.* at 567−68.  The court reasoned that "these allegations do not bring the meaning of *any* CBA provision into dispute." *Id.* at 567 (emphasis added).  This case is different.  SWAPA only brought RLA (Section 2, Third and Fourth) claims, and Southwest's conduct—revoking Captain Roebling's CA Position in alleged retaliation for his union affiliation— is the same conduct forming the basis in the Grievance for the alleged violations of the CBA.

dispute described in the Grievance, and is neither a minor nor major dispute.  Specifically, SWAPA maintains that the Complaint is not only about Captain Roebling's reduced status, but also about Southwest's "broader hostility toward SWAPA."  ECF No. 18 at 23.

The Court disagrees.  The Fifth Circuit in *Atchison* rejected a similar argument that a dispute was neither a major nor a minor dispute because the plaintiff alleged a statutory violation under the RLA.  894 F.2d at 1467.  Citing the Supreme Court's decision in *Conrail*, the Fifth Circuit concluded that even if the plaintiff only alleged violations of the RLA, the dispute is minor if the carrier has "at least an arguable basis" for its actions under the express or implied terms of the CBA.  *Id.* at 1468.  Similarly, the Fifth Circuit in *Wright v. Union Pac. R.R. Co.* recently dismissed a claim under Section 2, Third and Fourth of the RLA for lack of jurisdiction because it was a "minor dispute subject to arbitration." 990 F.3d 428, 436 (5th Cir. 2021).  In that case, the Fifth Circuit reasoned that the carrier met its "relatively light burden" of showing that its conduct was governed by the CBA's "implied terms" when the carrier had previously engaged in the conduct of which the plaintiff complained.  *Id.* at 435 ("Wright's claim rests upon the CBA's implied terms . . . [because] Wright alleges that Union Pacific previously provided union representation during coaching sessions but then terminated her for requesting such representation.").

Here, SWAPA acknowledges in the FAC that Southwest has previously revoked Check Airmen qualifications.[5]  FAC ¶ 39.  Accordingly, even if § 18(A) or § 15 of the CBA do not expressly permit Southwest to unilaterally revoke a CA Position, Southwest's past practice of revoking Check Airman status for other pilots creates an "arguable basis" for Southwest's contention that the CBA permits the challenged conduct.  *See Atchison*, 894 F.29 at 1468.

---

[5] However, SWAPA alleges that none of the other Check Airmen had union affiliation.

Accordingly, Southwest's conduct was at least arguably justified under the terms of the CBA, so SWAPA's statutory claim is part of a minor dispute.  SWAPA points to its allegations that stripping Captain Roebling's CA Position is evidence that if a pilot gets involved with SWAPA, Southwest will retaliate.  *See, e.g.*, FAC ¶ 41.  However, the only act of retaliation that was pleaded in the FAC was the act of revoking his CA Position, which is coextensive with the conduct SWAPA challenged in the Grievance and the crux of the CBA dispute.

Therefore, whether characterized as disciplinary or not, the grieved conduct is a "minor" dispute that requires interpretation and application of the CBA.  The RLA dictates that a minor dispute is subject to compulsory and binding arbitration—absent an exceptional circumstance justifying departure from this general rule.  *See Atchison*, 894 F.2d at 1468 n.10.

### B. Determination of Whether an Exception Applies to the General Rule that the Court Lacks Jurisdiction Over Minor Disputes

Southwest argues that SWAPA has failed to sufficiently allege that any exception applies to justify this Court exercising jurisdiction over this minor dispute, because Southwest's dispute resolution framework is available, and SWAPA failed to sufficiently plead anti-union animus.[6]

The first special exception described in *Atchison*, that the "dispute-resolution framework of the RLA is either ineffective . . . or unavailable," does not exist here.  894 F.2d at 1468 n.10. The Fifth Circuit in *Frontier* identified two instances where injunctive relief could be appropriate in a minor dispute because a dispute resolution framework is unavailable: first, to prevent strikes that would deprive the congressionally established grievance process of jurisdiction; and second, to prevent disruptions to the status quo, where not enjoining the carrier would result in

---

[6] The RLA "'provides an exhaustively detailed procedural framework'" to facilitate "dispute resolution through private mechanisms." *Carter*, 353 F. Supp. at 571 (applying RLA Section 2, Third and Fourth and finding that the dispute was not minor, but dismissing the case because anti-union animus was not adequately pleaded) (quoting *TWA*, 489 U.S. at 441).

17

irreparable injury of such a magnitude as to render a decision for the union virtually meaningless. 664 F.3d at 542.  Here, §§ 16 and 17 of the CBA provide grievance and arbitration procedures under a System Board for minor labor disputes.  CBA §§ 16(A)(1)(a), 17(B)–(C) (Southwest App'x at App. 184, 189).  On June 1, 2021, SWAPA utilized these procedures by filing the Grievance, alleging the "unacceptable form of Pilot discipline" against Captain Roebling was motivated by Southwest's disapproval for Roebling's "affiliation with SWAPA and [] participation in union activities," in violation of § 15 of the CBA and the RLA.  Grievance at App. 8–10.  After the Grievance was filed, Southwest offered to expedite arbitration.  *See* ECF No. 12 at 15.  There are no allegations that this procedure was unavailable or that engaging in this procedure would inflict irreparable injury of such a magnitude to render a decision in SWAPA's favor virtually meaningless.  Accordingly, the Court concludes that this exception does not apply.

As for the second exception, union animus,[7] a plaintiff must plead "discrimination or coercion against the representative" such that "the essential framework for bargaining between management and the union" may break down.  *Ass'n of Professional Flight Attendants v. Am. Airlines, Inc.*, 843 F.2d 209, 211 (5th Cir. 1988).  The Fifth Circuit has recognized that this exception exists when the carrier terminates or indefinitely suspends an active union participant after the union participant expressly promotes pro-union principles contrary to the carrier's best interests.  *See, e.g.*, *BLET*, 31 F.4th at 337 (applying Section 2, Third of the RLA); *Bhd. of R.R. Trainmen v. Central of Ga. Ry. Co.* ("*Georgia*"), 305 F.2d 605 (5th Cir. 1962) (applying Section 2, Third of the RLA).

---

[7] Actions must have been taken by the carrier "for the purpose of weakening or destroying a union," and the Fifth Circuit refers to this exception as the "animus exception."  *Atchison*, 894 F.2d at 1468 n.10; *BLET*, 31 F.4th at 345.

In *BLET*, the carrier indefinitely suspended only active union participants in connection with an off-duty fight that involved both union and non-union coworkers, despite a policy to discipline everyone who participates in fights.  The union sued under Section 2 of the RLA for wrongful employee discipline and "surveillance of the Union," alleging that the carrier's actions were motivated by anti-union animus.  The Fifth Circuit in *BLET* retained jurisdiction of the dispute because the union pleaded that the "selective discipline" of active union participants— five of which led the union's local division—rendered the local union division inoperable, effectively leaving all local employees without union representation.  *BLET*, 31 F.4th at 341, 345; *see also Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.*, 2021 WL 2784318, at \*1–2 (W.D. Tex. July 2, 2021).  The union leaders had been acting contrary to the carrier's interest, by vocally discouraging employees from taking "shoves," which are acts of voluntarily taking extra work and are considered "pro-company" practices.  *See id.* at 340, 347.

In *Georgia,* the disciplined employee was on a leave of absence from the railroad to serve as a "full time representative" of the union, advising employees about settlement agreements and encouraging employees to file employment-related suits.  *See* 305 F.2d at 606.  He received notice from the railroad to appear at a disciplinary investigation for acting in "'gross disloyalty to the railroad.'"  *Id.*  The court found that the railroad's disciplinary investigation was "baseless," and it retained jurisdiction based on the pleadings, which it found sufficiently alleged animus and retaliation based on union activity.[8]  *See id.* at 608.

---

[8] The viability of this case as binding authority has been challenged because the court analyzed the union's complaint under the pre-*Twombly* "fair notice" pleading standard recited in *Conley v. Gibson*, 355 U.S. 41 (1957). *See Int'l Ass'n of Machinists & Aerospace Workers v. Nw. Airlines, Inc.*, 673 F.2d 700, 709 (3d Cir. 1982) (analyzing *Georgia* and finding that the Fifth Circuit "had to accept the allegations in the complaint as true").  Judge Brown, the author of *Georgia*, later wrote an opinion as a visiting judge on the First Circuit, wondering whether his earlier ruling in *Georgia* gave "sufficient deference" to the RLA's preference for arbitration."  *Nat'l R. Passenger Corp. v. Int'l Ass'n of Machinists & Aerospace Workers*, 915 F.2d 43, 53 n.15 (1st Cir. 1990).  However, the Fifth Circuit recently applied the anti-union animus exception.  *BLET*, 31 F.4th at 344 n.4.

Here, in support of its allegations of anti-union animus, SWAPA alleges that Captain Roebling was stripped of his CA Position in March 2021 solely because of one text message, while Person B sent a more inappropriate text, yet retained his CA Position.  SWAPA also identifies an anti-union participation policy that Southwest repealed before April 2019, and a manager's alleged threat in April 2019 that Southwest would "strip [Captain Roebling's] quals" for taking a union position, and SWAPA cites to *BLET* and *Georgia,* to argue that the Court has jurisdiction under the anti-union animus exception.

*BLET* and *Georgia* do not mandate a similar result here.  The Court finds that SWAPA failed to sufficiently plead anti-union animus based on Southwest's actions in demoting Captain Roebling.  Captain Roebling was not an active union participant, let alone an officer or committee member, when his CA Position was revoked in March 2021.  Moreover, although the FAC describes alleged threats from a manager in April 2019 and vague allegations of "whisper campaigns" against SWAPA, the FAC acknowledges that Captain Roebling retained his CA Position while he was Co-Chair of the Check Airmen Committee from June 2019 to December 2020.  Accordingly, the timing of the alleged retaliation against Captain Roebling for active participation in SWAPA does not suggest anti-union animus; the alleged retaliation occurred after his active participation in SWAPA as Co-Chair ended.  In addition, although SWAPA points to Southwest's anti-union policy as evidence of animus, that policy was retracted two years before Captain Roebling's CA Position was revoked.

Moreover, the FAC does not allege that the revocation of Captain Roebling's CA Position impacted the union's operational capacity, like the situation in *BLET*.  Captain Roebling was stripped of his Check Airman status but retained employment.  In contrast, the disciplined employees in *Georgia* and *BLET* were indefinitely suspended or terminated from their

20

employment.  Further, Captain Roebling lost his CA Position only after being investigated for sending a text message found to be inappropriate and he does not deny so.  SWAPA does not allege that he was promoting practices contrary to Southwest's interests, such as encouraging lawsuits, as was done in *Georgia*, or discouraging overtime work, as was done in *BLET*.  In fact, the FAC contains no allegations that Captain Roebling took any action purportedly contrary to Southwest's interests.  *See generally* FAC.

The Court concludes that SWAPA has not pleaded anti-union animus, which is necessary to justify this Court exercising jurisdiction over this minor dispute.  Accordingly, the Court concludes that it lacks subject matter jurisdiction over SWAPA's claim under Section 2, Third and Fourth of the RLA.  The Motion to Dismiss is **GRANTED**, and the case is **DISMISSED**. The Court thus need not reach the question of whether SWAPA has established entitlement to injunctive relief.

### C.  Evidentiary Objections

SWAPA objects to, and moves to strike, portions of Captain Meehan's affidavit, attached as Exhibit A in Southwest's Appendix in Support of its Motion to Dismiss. CM Decl. (ECF No. 13-1 Ex. A) at App. 1–7. Certain paragraphs of the affidavit describe allegedly inappropriate interactions by Captain Roebling.  SWAPA argues that these paragraphs constitute inadmissible hearsay.  Southwest responds that it relies on these portions of Captain Meehan's affidavit only to establish multiple reasons for its removing Captain Roebling's CA Position.  ECF No. 22 at 1.

These paragraphs are not relevant to the basis for the Court's conclusion that this is a minor dispute and that the allegations of anti-union animus are insufficient to support judicial intervention in it.  Because these paragraphs were not considered, SWAPA's Motion to Strike is **DENIED AS MOOT**.

21

**V.      Conclusion**

Because the dispute between SWAPA and Southwest is minor, it is subject to compulsory and binding arbitration under the RLA and the exceptions to that finding do not apply here. Southwest's Motion to Dismiss (ECF No. 11) is therefore **GRANTED,** and SWAPA's Motion to Strike (ECF No. 20) is **DENIED AS MOOT**.

On September 23, 2022, SWAPA filed a Motion for Leave to File Second Amended Complaint (ECF No. 33) and attached the proposed Second Amended Complaint (ECF No. 33-2). SWAPA seeks leave to file the proposed Second Amended Complaint to add an additional allegation of anti-union animus. Specifically, the Second Amended Complaint alleges the following: Captain Roebling applied to have his CA Position reinstated, but on September 16, 2022, Captain Meehan responded that Southwest would not interview him. ECF No. 33-2 at 3. Captain Meehan explained that Check Airman candidates must "demonstrate a practice of adhering to the Company's workplace expectations, which include treating others with respect and civility" and that the "recurrent unprofessional behavior" for which Captain Roebling's CA Position was revoked, does not meet those expectations. *Id.* at 2–3. Additionally, Captain Meehan said that Captain Roebling has not "demonstrated a willingness to change" his behavior, and instead "contested [Southwest's] determination and publicly stated" that he did nothing to warrant removal of his CA Position. *Id.* at 3. SWAPA argues that Southwest denied Captain Roebling an interview because of Captain Roebling's public role in this lawsuit, and therefore violated the RLA. *Id.* at 3, 24.

This Opinion does not address the above allegation. The Second Amended Complaint is **DISMISSED**, but SWAPA may replead the above-described new allegation within two weeks, but no other allegation without leave of court.

**SO ORDERED**.

September 27, 2022.

BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE